Scates, Justice, delivered the opinion of the court: The indictment charged that Willard unlawfully did secrete one Julia, by name, being a mulatto girl, and person of color, and who was a slave owing service, as such, to Sarah W. Liles, in the state of Kentucky, under and by virtue of the laws of said state, and in the state of Louisiana in and by virtue of the the laws thereof, in which latter state Sarah W. Liles re- [* 469] sides; and that said slave escaped from the possession and ' custody of said Sarah, the owner, without her knowledge or consent, while in the state of Illinois, and passing from the state of Kentucky to the state of Louisiana, through the state of Illinois; all of which facts were then and there known to said Willard. To this indictment Willard demurred ; the demurrer was overruled | and he abiding by his demurrer, the court imposed a fine upon him. This is assigned for error. The 149th section of the criminal code provides that, “ If any person shall harbor or secrete any negro, mulatto, or person of color, the same being a slave or servant, owing service or labor to any other person, whether they reside in this state or in- any other state, or territory, or district, within the limits and under the jurisdiction of the United States, or shall in any wise hinder or prevent the lawful owner or owners of such slaves or servants from retaking them in a lawful manner, every such person so offending shall be deemed guilty of a misdemeanor and fined not exceeding five hundred dollars, or imprisonment not exceeding six months.” It is contended that this section is in violation of the 3d clause of the second section of the 4th article of the constitution of the United States, which provides that “ No person held to service or labor in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be duethat it violates the act of congress which was passed to carry into effect this provision of the constitution; that it violates the 1st section of the 6th article of the constitution of the state of Illinois, the 1st section of the 8th article, and the ordinance of 1787. To maintain these propositions, a wide range of argument was gone into, and much discussion had upon the institution and nature of slavery, and the interpretations, and rules of interpretation of the constitutions of the general and state governments by the courts of the United States, and the separate states. Many of the authorities cited and read on the argument shed much light upon the science of the law, but have no application to the questions presented in this case. The rules of interpretation, and the construction of the constitution of the United States, on most points that have been adjudicated, have been so firmly settled, and are so well known, that it needs not to state them or cite the reports for vouchers, as they have become axioms in the service of constitutional law, and the common property of the profession. The late case of Prigg v. The Commonwealth of Pennsylvania, 16 Peters 539, has shed much light upon the above clause [*470] of the constitution; in which it is held that the power to legislate on the subject of fugitive slaves, as provided in that clause, belongs exclusively to congress, and that no state can pass any law either amendatory or ancillary to the legislation of congress; that any state legislation intended to aid the master, or punish individuals, in addition to the penalty imposed by the act of congress, for hindering the owner from recovering his slave, etc., is ancillary to the act of congress, and therefore unconstitutional and void. This then settles the question, as to state legislation upon that subject, and for those objects. The argument of the court has proceeded to the very verge of jurisdictional boundaries between the national and state governments; but the court expressly admits that the states have jurisdiction to provide police regulations, for the preservation of order, the administration of its own affairs, and internal intercourse. And here we approach a most delicate question of jurisdiction between the two governments. If no regulation by a state is constitutional, which may incidentally afford protection to the rights of slaveholders, no matter how essential it may be to preserve quiet and order in our community; to protect us from vagabond, or pauper slaves; to punish or prevent them from entering our territory, if we think proper; to forbid it, or punish those who may encourage them to come, or harbor or secrete them, while here, we are then, indeed, exposed irremediably, for hundreds of miles of contiguous boundary with Missouri and Kentucky, to heartburnings, criminations, and recriminations, quarrels, brawls, excitements, affrays, and breaches of the peace, arising from the influx of that unwelcome population, and the • disturbances to which it may and does give rise. The power is so indispensable to our well being, and the good ordering of our own affairs, that I cannot doubt the power of the legislature to regulate it. The latter clause of the section does most clearly fall within the principles of that decision; but the clause of the section under which the plaintiff is charged, neither gives the owner damages, nor apprehends, or restores the slave, nor in any way affects or furthers his claim or promotes his, rights, unless it does so incidentally, by forbidding acts which may occasion disorders in our own society. If this view of the nature of this act of our legislature be correct, it is a police regulation, and- is not ancillary to the act of congress, or in violation qf the constitution of the United States. The remaining question is as to the repugnancy of this act to our own constitution and the ordinance of 1787. The case of Sarah v. Borders, ante 341, and the cases there referred to, have discussed the effect of the ordinance upon our legislation. All persons in this state are deemed to be free (3 Scam. 71), but the indictment declares that Julia is a slave, and the demurrer admits all the facts that are well pleaded. Did then the constitution effect her emancipation on entering our borders ? [* 471] The demurrer admits that Julia is a slave owing service to Mrs. Liles in the state of Louisiana, where she resides; and that the slave was brought into this state merely on and for the purpose of herpassage from Kentucky to Louisiana, and that Julia escaped without her knowledge or consent. The only question, therefore, is, the right of transit with a slave. For if the slave upon entering our territory, although for a mere transit to another state, becomes free under the constitution, then the defendant in error is not guilty of concealing such a person as is described in the law and in the indictment. I cannot see the application to this case, if the law of nations in relation to the domicil of the owner fixing the condition of, and securing the right of property in this slave, and regarding the slave as apart of the wealth of the state of Louisiana; and our obligation of comity to respect and enforce that right. Story’s Conflict of Laws §§ 27-29, 33-38, as to the meaning and rights of “ comity,” §§ 349, 414, 472. As the question is here presented, it is not as to the civil rights of the master and slave, being affected by our constitution, or. whether by the laws of this state the owner could enforce the obligation of service; but it is as to the guilt of the plaintiffin error, in violating the provisions of our municipal regulations. It may be one thing to recognise the existence of the laws and institutions of another government or nation, as fixing a condition of slavery upon a part of her population, and creating, sanctioning, and enforcing the rights of masters over it; and another thing to provide remedies to enforce those rights within our jurisdiction. Story’s Conflict of Laws, § 196 and 96 a, and authorities referred to. The 149th section of the criminal code, for a violation of which the plaintiff is indicted, does most distinctly recognise the existence of the institution of slavery in some of these United States, and whether the constitution and laws of this state have or have not provided adequate remedies to enforce, within its jurisdiction, that obligation of service, it has provided by this penal sanction, that none shall harbor or conceal a slave within this state, who owes such service out of it. Every state or government may, or may not, as it chooses, recognise or enforce this law of comity. Story’s Conflict of Laws 57 ; 18 Peters 519, 589. And to this extent this state has expressly done so. If we should therefore regard ourselves as a distinct and separate nation from our sister states, still as by the law of nations (Vattel, Book 2, 183, eh. 10, § 132, 184, §§ 133-4), the citizens of one government have a right of passage through the territory of another, peaceably for business or pleasure, and that too without the latter’s acquiring any right over the person or property (Vattel, Book 2, 174, §§ 107-9), we could not deny them this international right, without a violation of our duty. Much less, could we disregard their consti- [* 472] tutional right, .as citizens of one of the states, to all the rights, immunities, and privileges of the citizens of the several states. England will not enforce the law of comity in relation to the institution of slavery in other countries, 2 Hag. 94; 2 Barn. & Gres. 448; 3 D. & R. 679 ; Sommersette’s ease, Loffts. 1. Neither will Massachusetts, 18 Pick. 193; 8 Metcalfe 72. France has made a partial recognition of it only. Law of slavery 348, But Louisiana (8 Louisiana 475 ; 14 Martin 401), Kentucky (2 A. K. Marsh, 476-7), Missouri (3 Missouri 271-2), Mississippi (Walker’s Miss. 36), Virginia (1 Leigh. 172; Gilmer 143; Munf. 393; 6 Randolph 566), have recognised it, and held persons to be free, who had become so by the laws and constitutions of free states. It would be productive of great and irremediable evils, of discord, of heart burnings, and alienation of kind and fraternal feeling, which should characterize the American brotherhood, and tend greatly to weaken, if not to destroy the common bond of union amongst us, and our nationality of character, interest and feeling. Thousands from Kentucky, Virginia, Maryland, Tennessee and the Carolinas, and other southern states have sought and found free and safe passage with their slaves across our territory, to and from Missouri. It would be startling, indeed, if we should deny our neighbors and kindred that common right of free and safe passage, which foreign nations would hardly dare deny.. The recognition of this right is no violation of our constitution. It is not an introduction of slavery into this state, as was contended in argument; and the slave does not become free by the constitution of Illinois by coming into the state for the mere purpose of passage through it. It is the opinion of the court that the judgment be affirmed.